# Exhibit A

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY

DR. ADIL JAFFER  
Plaintiff

CASE NO. 2021 CV 00225  
JUDGE ANDREW D. LOGAN

STEWARD MEDICAL GROUP, INC.  
Defendant.

### WAIVER OF THE SERVICE OF SUMMONS.

To:  John E. Moran

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from March 5, 2021, the date when this request was sent.  If I fail to do so, a default judgment could be entered against me or the entity I represent.

Date:  March 11, 2021

_____  (Signature)

Vincent J. Tersigni  (Printed name)

Address:  
Jackson Lewis P.C.  
Park Center Plaza I, 6100 Oak Tree Blvd., Suite 400  
Cleveland, OH 44131

Email Address:  vincent.tersigni@jacksonlewis.com

Telephone number:  216/750-4315

{01548223-1}

Exhibit A



**McCARTHY LEBIT**
**CRYSTAL & LIFFMAN CO., LPA**
101 W. Prospect Ave., Suite 1800, Cleveland, OH 44115-1088

Jack E. Moran
Attorney-at-Law
Writer's Ext.: 143
Jem@mccarthyleblt.com

March 5, 2021

Vincent J. Tersigni, Esq.
Park Center Plaza I
Suite 400
6100 Oak Tree Boulevard
Cleveland, OH 44131

MAR 0 8 2021

    Re:    <u>**Dr. Adil Jaffer v. Steward Medical Group, Inc.**</u>

Dear Mr. Tersigni:

    Enclosed please find the Waiver of Service of Summons with regard to the above-captioned matter.

Sincerely yours,

Jack E. Moran

JEM/nm
Enclosure

{01548264}

**EXPECT MORE. GET MORE.**
mccarthyleblt.com  o: 216-696-1422  f: 216-696-1210
Exhibit A

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY

DR. ADIL JAFFER
Plaintiff

CASE NO. 2021 CV 00225

JUDGE ANDREW D. LOGAN

STEWARD MEDICAL GROUP, INC.
Defendant.

### RULE 4.7 NOTICE OF A LAWSUIT AND
### REQUEST TO WAIVE SERVICE OF SUMMONS.

To:    Steward Medical Group, Inc., 111 Huntington Avenue, Suite 1800, Boston, Massachusetts 02199
(c/o Vincent J. Tersigni, Esq., Park Center Plaza I, Suite 400, 6100 Oak Tree Boulevard, Cleveland, Ohio
44131)

#### WHY ARE YOU GETTING THIS?

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown
above. A copy of the complaint is attached.  This is not a summons, or an official notice from the court. It
is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the
enclosed waiver. To avoid these possible expenses, you must return the signed waiver within 28 days from
the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed,
along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may
keep the other copy.

#### WHAT HAPPENS NEXT?

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had
been served on the date the waiver is filed, but no summons will be served on you and you will have 60
days from the date this notice is sent (see the date below) to answer the complaint. **If you do not return
the signed waiver within the time indicated, I will arrange to have the summons and complaint
served on you. And I will ask the court to require you, or the entity you represent, to pay the
expenses of making service.**

Please read the enclosed statement about the duty to avoid unnecessary expenses.  I certify that this
request is being sent to you on the date below.

Date:  March 5, 2021

John E. Moran  (#0087272)
*jem@mccarthylebit.com*
McCARTHY, LEBIT, CRYSTAL
  & LIFFMAN CO., L.P.A.
101 West Prospect Avenue
1800 Midland Building
Cleveland, Ohio  44115
(216) 696-1422

{01548223-1}

Exhibit A

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY

DR. ADIL JAFFER                         CASE NO. 2021 CV 00225
Plaintiff                               JUDGE ANDREW D. LOGAN

STEWARD MEDICAL GROUP, INC.
Defendant.

### WAIVER OF THE SERVICE OF SUMMONS.

To:    John E. Moran

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from March 5, 2021, the date when this request was sent.  If I fail to do so, a default judgment could be entered against me or the entity I represent.

Date: _____

_____ (Signature)

_____ (Printed name)

Address:

_____
_____
_____

Email Address:        _____

Telephone number:    _____

{01548223-1}

Exhibit A

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY**

DR. ADIL JAFFER
Plaintiff

CASE NO. 2021 CV 00225
JUDGE ANDREW D. LOGAN

STEWARD MEDICAL GROUP, INC.
Defendant.

**WAIVER OF THE SERVICE OF SUMMONS.**

To:    John E. Moran

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from March 5, 2021, the date when this request was sent. If I fail to do so, a default judgment could be entered against me or the entity I represent.

Date: _____

_____ (Signature)

_____ (Printed name)

Address:

_____

_____

Email Address:        _____

Telephone number:     _____

{01548223-1}

Exhibit A

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY

### DUTY TO AVOID UNNECESSARY EXPENSES OF SERVING A SUMMONS

Rule 4.7 of the Ohio Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is subject to the court's personal jurisdiction and who fails to return a signed waiver of service requested by a plaintiff may be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does not include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

{01548223-1}

Exhibit A

KAREN INFANTE ALLEN
TRUMBULL CO CLERK OF COURTS
2021 CV 00225 ADL
FILED: 03/04/2021 03:44 PM

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| DR. ADIL JAFFER<br>3900 Dorado Beach Drive<br>Canfield, Ohio 44406 | ) ) ) ) | CASE NO.<br><br>JUDGE |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| STEWARD MEDICAL GROUP, INC.<br>111 Huntington Avenue<br>Suite 1800<br>Boston, Massachusetts 02199 | ) ) ) ) ) | **COMPLAINT**<br><br>**(Jury Trial Requested)** |
| ALSO SERVE:<br>Steward Medical Group, Inc.<br>c/o its Statutory Agent<br>CT Corporation System<br>4400 Easton Commons Way<br>Suite 125<br>Columbus, Ohio 43219 | ) ) ) ) ) ) ) ) | |
| Defendant. | ) ) | |

Plaintiff, Dr. Adil Jaffer ("Plaintiff"), through counsel, files this Complaint against Steward Medical Group, Inc. ("Defendant"), and alleges as follows:

### THE PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, Dr. Adil Jaffer ("Dr. Jaffer"), is a citizen of the State of Ohio, County of Mahoning.

2.     Defendant, Steward Medical Group, Inc. ("SMG"), is a Massachusetts corporation with its principal place of business in Boston, Massachusetts, in the County of Suffolk. SMG operates several healthcare facilities and employs physicians in Trumbull County, Ohio.

Exhibit A

3.      At all times relevant hereto, Dr. Jaffer was employed by SMG in Trumbull County, Ohio, at 4308 Belmont Avenue, Suite 1, Youngstown, Ohio 44505.

4.      Jurisdiction is proper in this Court as SMG resides in this State and/or caused tortious injury by an act or omission in this State and/or regularly does, solicits, or transacts business in this State and/or Defendant's contacts with this State are of such a continuous and systematic nature that jurisdiction is appropriate.

5.      Venue is proper in this Court pursuant to Civ. R. 3(C)(3) and/or (6).

<u>FACTS</u>

6.      Dr. Jaffer incorporates by reference Paragraphs 1 through 6, as if fully rewritten herein.

7.      Dr. Jaffer is an accomplished and well-respected family medicine physician. He has been practicing medicine for nearly two decades, while managing a second-generation community practice in Trumbull County, Ohio.

8.      Through his excellent care and steady oversight, Dr. Jaffer has built strong relationships throughout the Northeast Ohio medical community, including relationships with fellow medical providers to whom he felt comfortable entrusting his patients when the need for a medical referral was appropriate.

9.      Dr. Jaffer also developed strong relationships with his patients, and the quality of their care was his uppermost priority, including when Dr. Jaffer was determining to whom he would make a medical referral.

10.     Dr. Jaffer has received training and mentorship throughout his career in which he learned that physicians cannot receive payments for referrals, that payments to physicians in exchange for referrals are illegal, and that participation in federal government healthcare

2

Exhibit A

reimbursement programs, like Medicare, requires that physicians refrain from such illegal conduct.

11.    In the first half of 2018, SMG, through its agents, began approaching Dr. Jaffer about the prospect of joining its network of physicians. SMG, together with its parent, affiliates, and subsidiaries, including, but not limited to, Steward Health Care System LLC and MPT of Youngstown-Steward, LLC (collectively, the "Steward Network"), had been operating in various regions throughout the United States and was eager to gain a foothold in the Northeast Ohio market. Upon information and belief, SMG's expansionist aspirations were driven by private equity investment interests, which were determined to extract greater revenue out of the healthcare industry.

12.    In or around August 2018, SMG purchased Dr. Jaffer's ongoing medical practice and simultaneously agreed to re-employ Dr. Jaffer as an SMG physician.

13.    While SMG acquired other medical practices in or around the same time in the Northeast Ohio community, SMG did not incorporate into the Steward Network all of the providers and facilities to whom Dr. Jaffer had grown comfortable referring his patients. SMG did, however, acquire certain facilities and medical practices within the Northeast Ohio area under a variety of affiliated entities, all of which were owned and operated by SMG and/or SMG's parent or affiliated entities within the Steward Network.

14.    SMG proposed that Dr. Jaffer be employed at a salary rate above what Dr. Jaffer would have expected to be the fair market value of his day-to-day patient care productivity. The salary rate exceeded Dr. Jaffer's potential collections and was noticeably above what a family medicine physician would typically expect in Dr. Jaffer's geographic region.

3

Exhibit A

15. Dr. Jaffer was initially concerned with the proposed salary rate as he wanted to avoid establishing a productivity expectation that would not have been feasible.

16. When Dr. Jaffer expressed misgivings about the aggressive salary rate, SMG employee Daniel Knell ("Knell") was dismissive of Dr. Jaffer's concerns and, at the time, instructed Dr. Jaffer to view the compensation simply as recognition for the sale of his medical practice.

17. The terms of Dr. Jaffer's employment at SMG were such that it was terminable at will, with either party bearing the ability to terminate the employment arrangement at any time, with or without cause.

18. During the transition associated with Dr. Jaffer joining SMG, Knell was transferred out of his position. Prior to beginning his employment with SMG, Dr. Jaffer re-emphasized his concerns about his high salary rate to Knell's successor, Therese Cullen ("Cullen"). Cullen also attempted to assuage any concerns that Dr. Jaffer had, and specifically told Dr. Jaffer that his compensation was not directly tied to any expected productivity metrics.

19. Despite the prior assurances, shortly after Dr. Jaffer began his new employment, SMG representatives began criticizing Dr. Jaffer's practice of referring his patients, where necessary and/or appropriate, through his well-established medical relationships throughout Northeast Ohio. Instead, SMG representatives, as described further below, began insisting, to both Dr. Jaffer and his staff, that patients must be referred to facilities within the Steward Network.

20. SMG's criticism of Dr. Jaffer's referring practices arose because, when patients were referred outside the Steward Network, SMG and/or its affiliates were not reaping the revenue associated with the health services provided by those to whom Dr. Jaffer referred.

4

Exhibit A

21. Dr. Jaffer was not categorically opposed to referring his patients to other providers and facilities within the Steward Network. He would not, however, refer a patient to a provider or facility solely or primarily because that provider or facility was within the Steward Network. Instead, Dr. Jaffer based all of his referral decisions on the best interest of the patient, in terms of quality of care, professional competence, convenience, ease of access, and the prompt delivery of care. Dr. Jaffer also was aware that SMG was not legally permitted to pay him for referrals.

22. Dr. Jaffer soon realized that SMG operated pursuant to a policy that referrals be kept "in network," meaning within the Steward Network of providers and facilities owned and/or operated by SMG and/or its affiliates, regardless of quality of care, professional competence, convenience, ease of access, or the prompt delivery of care.

23. SMG would convene weekly meetings with Dr. Jaffer's staff to stress the importance of keeping referrals within the Steward Network.

24. In supervising Dr. Jaffer's office and others, SMG employed "Practice Managers," who oversaw groups of physicians and locations and were charged with ensuring that SMG physicians keep all referrals "in house."

25. SMG Practice Managers relied upon internally-generated referral reports to ensure that SMG physicians were not exceeding a predetermined "out-of-network" referral threshold – which would indicate that "too many" referrals were being sent outside the Steward Network.

26. SMG also employed Operations Specialists who would pressure physicians and their staff to refer patients within the Steward Network.

5

Exhibit A

27.     A considerable segment – somewhere between fifty to sixty percent (50-60%) –
of Dr. Jaffer's patient base consists of Medicare recipients.

28.     When Dr. Jaffer referred his Medicare patients for clinical laboratory services,
imaging services, and other designated health services as defined by 42 U.S.C. § 1395nn(h)(6),
the services provided by the provider to whom Dr. Jaffer had referred would seek reimbursement
from the federal government – specifically, the Centers for Medicare and Medicaid Services
("CMS").

29.     SMG's insistence that Dr. Jaffer refer his patients within the Steward Network
included referrals for the above-referenced "designated health services" for Dr. Jaffer's Medicare
patients.

30.     The 1989 Ethics in Patient Referrals Act (herein, the "Stark Law"), 42 U.S.C. §
1395nn, prohibits healthcare providers from paying physicians like Dr. Jaffer for making
referrals for services that are to be reimbursed by Medicare.  Thus, under the Stark Law, it is
illegal for SMG to compensate Dr. Jaffer in exchange for referrals to the Steward Network.

31.     The Stark Law has an exception for bona fide employment relationships, but this
exception is limited.  The exception only applies, for example, if (i) the physician-employee's
compensation is consistent with the fair market value of the services provided by the physician,
(ii) the amount of remuneration paid does not take into account – directly or indirectly – the
volume or value of any referrals, and (iii) the amount of compensation would be commercially
reasonable even if no referrals are made to the employer.  42 U.S.C. § 1395nn(e).

32.     Dr. Jaffer's employment terms do not meet the above-described exception to the
Stark Law, as his compensation with SMG was well above his productivity or geographic market
rate and – as described further below – SMG eventually revealed that his compensation did in

6

Exhibit A

fact take into account the volume and value of referrals that Dr. Jaffer would make to the Steward Network.

33.     Even if Dr. Jaffer's employment compensation satisfied the requirements of the Stark Law's bona fide employment exception as described above – which it does not – the Stark Law mandates that any requirement to make referrals within the Steward Network be set out in writing and signed by Dr. Jaffer, and even then the Stark Law would prohibit SMG's referral policy unless the policy provided exceptions if (i) the patient expressed a preference for a different provider, practitioner, or supplier, (ii) the patient's insurer determines the provider, practitioner, or supplier, or (iii) the referral is not in the patient's best medical interests in the physician's judgment. 42 C.F.R. § 411.354(d)(4).

34.     SMG did not take any steps to comply with the above-described dictates of the Stark Law.  In fact, SMG's referral policy is in direct contravention of that law.

35.     The Federal Medicare and Medicaid Anti-Fraud and Abuse Amendment (herein, the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b, also prohibits healthcare providers from paying remuneration to individuals, including physicians, who make referrals to providers for healthcare services that may be reimbursed by Medicare.

36.     The Anti-Kickback Statute contains criminal penalties against those who violate its dictates, specifying, *inter alia*, that a person who knowingly and willfully offers to pay remuneration, directly or indirectly, overtly or covertly, to induce a referral "shall be guilty of a felony."

37.     The Anti-Kickback Statute also contains certain exceptions, but again none applied to Dr. Jaffer's arrangement with SMG.  While the Anti-Kickback statute exempts "any amount paid...for employment in the provision of covered items or services," SMG was

7

Exhibit A

attempting to pay Dr. Jaffer for much more than the provision of "covered items or services," and instead also sought to pay him an augmented "salary" with the expectation that he would make and keep his referrals within the Steward Network.

38. When healthcare providers like SMG submit a claim for reimbursement for medical services to CMS, they have to certify that they have complied with the Stark Law and the Anti-Kickback Statute.

39. When healthcare providers like SMG provide periodic reporting to CMS summarizing their claims and payments, they have to certify that they have complied with the Stark Law and the Anti-Kickback Statute.

40. Without regard for the above-described laws, SMG Business Director Bryan Dinger ("Dinger") insisted that Dr. Jaffer's patients be referred to facilities and providers within the Steward Network, criticized Dr. Jaffer for his referrals, and began complaining that Dr. Jaffer was "overpaid."

41. SMG's efforts to influence Dr. Jaffer to change his referral practices included statements – like Dinger's referenced above – that SMG was concerned it was paying Dr. Jaffer too much for his employment. Thus, SMG's efforts to influence Dr. Jaffer to change his referral practices revealed that SMG intended to pay Dr. Jaffer his aggressive salary because it expected him to refer his substantial patient base within the Steward Network.

42. Upon hearing SMG's concerns about being "overpaid," Dr. Jaffer would ask what productivity metrics he would need to achieve in order to relieve SMG's concerns about his compensation level. Whenever Dr. Jaffer pressed on this topic, however, Dinger would tell Dr. Jaffer that it was "not just about the [productivity] numbers," but also that Dr. Jaffer had to start sending all his patient referrals through the Steward Network.

Exhibit A

43.    Steward Operations Specialist Susan Higham ("Higham") also badgered Dr. Jaffer in an attempt to coerce him to increase his referrals to the Steward Network. Higham further interrogated Dr. Jaffer's office staff as to why certain patients were not being sent to the Steward Network.

44.    Based on SMG's policy regarding referrals, the pressure being exerted on him from SMG management to keep referrals "in house," and the apparent connection between his referrals and his salary level in those discussions with SMG management, Dr. Jaffer developed an objectively reasonable belief that enforcement of the SMG referral policy could and would result in the presentment of a false claim for payment to the government in that it would result in SMG falsely certifying that it had complied with the Stark Law and the Anti-Kickback Statute.

45.    Dr. Jaffer had a good faith, reasonable belief that SMG's attempts to pay Dr. Jaffer in exchange for patient referrals were illegal under the above-referenced federal laws.

46.    In addition to refusing to refer his patients to only Steward network facilities, and instead affirmatively referring his patients elsewhere, Dr. Jaffer also resisted SMG's pressure through other channels. Through conversations with SMG management, Dr. Jaffer advised that the referral expectations were improper, inappropriate, and dishonest. Dr. Jaffer thus told SMG management that, in many instances, his office could not comply with SMG's referral policy as a result of its impropriety. Members of Dr. Jaffer's staff echoed these concerns regarding the propriety of the SMG referral policy to SMG management when they were pressed on patient referrals, so as to ensure that Dr. Jaffer's position was consistent.

47.    Thus, SMG management was aware that Dr. Jaffer was not complying with the referral policy because, *inter alia*, he did not believe the referral policy was legally permissible or enforceable.

Exhibit A

48.     Paradoxically, SMG also maintains an internal policy that ostensibly prohibits unlawful kickbacks and/or violations of the Stark Law and/or the Anti-Kickback Statute. This policy encourages employees to report concerns, at least with respect to the Anti-Kickback Statute. Nevertheless, SMG never investigated any of Dr. Jaffer's concerns about the propriety of the SMG referral policy. Instead, SMG simply continued to press Dr. Jaffer and his office to reroute their referrals to the Steward Network.

49.     While the exact number is currently unknown, from the inception of his employment with SMG until its termination, Dr. Jaffer – based on his above-described concerns – refused to follow Steward's referral policy and instead referred a significant volume of Medicare patients outside the Steward Network in contravention of that referral policy.

50.     Dr. Jaffer thus refused to participate in unlawful activity at SMG based on a reasonable belief that the activity would result in a fraudulent claim for payment to the federal government.

51.     Submitting to CMS claims for reimbursement for medical services when those claims arose specifically because a provider had referred the patient in exchange for kickback – even if that kickback is characterized and camouflaged as "salary" – is unlawful under the Stark Law and the Anti-Kickback Statute.

52.     Dr. Jaffer's lawful actions prevented SMG from making claims to CMS for patients when such claims would have violated the Stark Law and/or the Anti-Kickback Statute.

53.     Dr. Jaffer's actions prevented SMG from making false certifications to CMS in exchange for reimbursements.

54.     Dr. Jaffer also held sincere concerns that SMG's referral policy jeopardized patient safety. Regardless of SMG's threats or scolding, Dr. Jaffer repeatedly refused to refer

10

Exhibit A

patients within the Steward Network if it was not in the best interest of the patient, and instead repeatedly referred his patients outside the Steward Network when in the best interest of the patient.

55.     Patient wait times presented one of several patient safety concerns.  Steward Network facilities would often have inordinately long wait times as compared to alternative options.  Unnecessarily extending the patient's wait time could adversely affect the patient's health outcomes.

56.     In the last few months of 2019, Dinger and SMG's Regional Medical Director, Dr. James Shina ("Dr. Shina"), had multiple conversations with Dr. Jaffer continuing the pressure on him to refer patients within the Steward Network.  Based on his above-described concerns, Dr. Jaffer continued to refer patients to the locations and providers that satisfied the patients' best interests, regardless of SMG's "bottom line."

57.     On or about December 30, 2019, Dinger met with Dr. Jaffer to terminate his employment.

58.     At this meeting, Dr. Jaffer asked Dinger whether his employment termination represented a larger, business-wide reduction of physician staff.  Dinger replied that Dr. Jaffer was the only physician being terminated as part of the process.

59.     Baffled, Dr. Jaffer called Dr. Shina to ask what had happened and "what did [he] do wrong?"  Dr. Shina told Dr. Jaffer directly: "The only thing you did wrong was you did not support the [SMG] referral network."

60.     Based on SMG's conduct and admission that it terminated Dr. Jaffer for failure to "support the referral network," SMG confirmed Dr. Jaffer's objectively reasonable belief that

11

Exhibit A

SMG was attempting to pay him – with such payments disguised as salary – for referrals, all in violation of federal law and in an attempt to submit a false claim for payment to CMS.

61.     Dr. Jaffer refused to acquiesce to SMG's attempts to pay him for referrals and, for that refusal, he was terminated.

62.     Following the termination meeting with Dinger, SMG elected to maintain Dr. Jaffer's employment for a brief notice period instead of paying him a severance.

63.     During the notice period, Dr. Jaffer ensured and confirmed that SMG had his new contact information, so that patients could be notified and their treatment could be seamlessly transitioned.

64.     SMG did not provide Dr. Jaffer with the information necessary for Dr. Jaffer to send patient notices himself, but SMG instead represented that it would send the notices to patients.

65.     At or around the termination of Dr. Jaffer's employment, SMG sent notices that failed to include Dr. Jaffer's new contact information and failed to comply with Ohio Revised Code § 4731.228.

66.     SMG also disconnected Dr. Jaffer's telephone number, despite contrary assurances otherwise, and interfered with patients' abilities to access Dr. Jaffer at his non-SMG location, thereby further interfering with patient care.

<u>**COUNT ONE**</u>
**(Unlawful Retaliation in Violation of the False Claims Act)**

67.     Plaintiff incorporates by reference Paragraphs 1 through 66, as if fully rewritten herein.

68.     Submitting claims for reimbursement and certifications in violation of the Stark Law and the Anti-Kickback Statute is a violation of the federal False Claims Act, 31 U.S.C. §§

12

Exhibit A

3729 et seq. As described herein, Dr. Jaffer engaged in activity protected under the False Claims Act by, *inter alia*, refusing to participate in SMG's unlawful referral system based on his belief that the system was illegal, insisting that his patients be referred outside the SMG Network when in the best interest of such patients, so as to stop false claims to CMS and avoid such illegality, and complaining about the propriety of SMG's unlawful referral system through multiple internal channels.

69.     Plaintiff had a good faith belief that SMG's practices were in contravention of law and would result in non-compliant, false claims to the government.

70.     Plaintiff's good faith belief in the illegality of SMG's referral system was objectively reasonable. The Stark Law and the Anti-Kickback Statute make it illegal for an employer to compensate a physician based on the volume of his referrals.

71.     Through its observations of his referral activity and its conversations directly with Dr. Jaffer, as well as communication with his staff, SMG management was well aware of Dr. Jaffer's protected activity, and terminated Dr. Jaffer's employment because of his protected activity.

72.     SMG lacked any legitimate business reason for its adverse action toward Dr. Jaffer, and its stated explanation for its conduct is a mere pretext for retaliation.

73.     As a result of SMG's conduct set forth above, Dr. Jaffer is entitled to compensation for all back pay, liquidated damages, front pay, interest, compensation for all economic and noneconomic loss, litigation costs, and reasonable attorneys' fees.

## COUNT TWO
### (Termination in Violation of Ohio Public Policy)

74.     Plaintiff incorporates by reference Paragraphs 1 through 73, as if fully rewritten herein.

Exhibit A

75. Dr. Jaffer's employment arrangement at SMG was such that his employment was terminable at will without cause.

76. Dr. Jaffer's employment occurred within the State of Ohio.

77. The State of Ohio maintains a public policy, through common law as well as Ohio Revised Code § 4101.11 and Ohio Revised Code § 4101.12, in favor of patient safety.

78. Ohio also has a public policy against a physician personally benefiting from the referral of patients, as set forth in Ohio Revised Code § 4731.22(B)(17).

79. Ohio also follows a public policy against compensation to a physician in exchange of referrals of Medicare patients, by virtue of the Stark Law and the Anti-Kickback Statute.

80. Terminating Dr. Jaffer's employment under the circumstances described herein jeopardizes Ohio's public policies in favor of patient safety, the prohibition on referral fee-splitting, and/or the policy against paying physicians in exchange for the referral of Medicare patients.

81. The State of Ohio, through Ohio Revised Code § 4731.22(B)(18), has also established a public policy against a physician engaging in any violation of the Code of Ethics of the American Medical Association ("AMA").

82. The AMA's Code of Ethics states that a "physician shall, while caring for a patient, regard responsibility to the patient as paramount," and should "be honest in all professional interactions."

83. In outlining the physician's responsibility to the patient, the AMA's Code of Medical Ethics Opinion 1.2.3 requires that referrals of patients be based on "the patient's medical needs" and not on the financial gain of the referring physician and/or his employer.

14

Exhibit A

84. Similarly, the AMA's Code of Medical Ethics Opinion 9.6.9 prohibits (a) business arrangements that require physicians to make referrals to a specific entity as a "condition of participation," (b) business arrangements that restrict physicians from "referring patients to competing facilities or services," and/or (c) physician arrangements in which the volume of referrals affects the physician's "financial benefit." Instead, referrals must be "based on objective, medically relevant criteria," and "structured to enhance access to appropriate, high quality health care services."

85. A referral scheme that requires that patients be referred "in-network" so as to preserve network revenue fails to holds the patient's needs as "paramount" in that it subrogates the patient's medical needs, conditions physician employment on making referrals to as to benefit the employer and/or its affiliates, prohibits referrals to competing facilities, and tethers the physician's compensation to his or her volume of "in-network" referrals.

86. SMG's internal policy requiring that referrals be kept within the Steward Network, regardless of the safety of the patient, stands in direct contravention to Ohio's clear public policies.

87. Dismissing employees under circumstances like those described herein would jeopardize Ohio's public policy requiring adherence to the AMA's Code of Ethics.

88. Dr. Jaffer's dismissal from employment at SMG was directly related to his efforts to preserve the public policies set forth above.

89. SMG lacks an overriding legitimate business justification for terminating employees who refer patients to the provider who can best serve the patient's needs.

90. As a direct and proximate result of SMG's wrongful termination of Dr. Jaffer's employment, Dr. Jaffer has suffered non-economic and economic injuries, including, but not

Exhibit A

limited to, pain and suffering and the loss of salary, benefits, and other privileges and conditions of employment, for which Dr. Jaffer is entitled to recover, in an amount that exceeds $75,000.00. All or a portion of Dr. Jaffer's damages are likely to continue indefinitely into the future.

91.     SMG's conduct was malicious, willful, wanton, and/or in conscious disregard of Dr. Jaffer's rights, rendering SMG liable for punitive damages and attorneys' fees.

<u>COUNT THREE</u><br>(Tortious Interference with Business Relations)

92.     Dr. Jaffer incorporates by reference Paragraphs 1 through 91, as if fully rewritten herein.

93.     Dr. Jaffer possessed a business relationship with his patients by which he would deliver excellent medical care in exchange for payment from his patients and/or their insurers.

94.     SMG was well-aware of Dr. Jaffer's relationships with his patients.

95.     SMG, without privilege to do so, intentionally interfered with Dr. Jaffer's relationships with his patients by, *inter alia*, failing to send the notices required under Ohio Revised Code § 4731.228 following the separation of Dr. Jaffer's employment, disconnecting telephone service at Dr. Jaffer's prior contact number so as to prevent patients from locating Dr. Jaffer's whereabouts, and preventing patients from transferring their medical records to Dr. Jaffer's new practice location with exorbitant charges and procedural obstructions.

96.     Dr. Jaffer was damaged by SMG's interference with his patient relationships following his departure from SMG's employment.

97.     As a direct and proximate result of SMG's tortious interference, Dr. Jaffer has been significantly damaged through, *inter alia*, lost wages and other income, and other damages in an amount to be more fully determined at trial, but in any event exceeds $75,000.00.

Exhibit A

98.     SMG's conduct was malicious, willful, wanton, and/or in conscious disregard of Dr. Jaffer's rights, rendering SMG liable for punitive damages and attorneys' fees.

**WHEREFORE**, Plaintiff, Dr. Adil Jaffer, seeks relief in an amount to fully, fairly, and justly compensate him for his injuries, damages, and losses, and respectfully prays that this Court enter judgment against Defendant, Steward Medical Group, Inc., and award back pay, front pay, compensatory damages, liquidated damages, costs, expenses, punitive damages, interest, and reasonable attorneys' fees incurred in the prosecution of this action, interest, and such other relief as this Court deems just, proper, and equitable.

Respectfully submitted,

*/s/ John E. Moran*
Ann-Marie Ahern (#0070020)
*ama@mccarthylebit.com*
John E. Moran  (#0087272)
*jem@mccarthylebit.com*
Frank T. George  (#0097925)
*ftg@mccarthylebit.com*
McCARTHY, LEBIT, CRYSTAL
  & LIFFMAN CO., L.P.A.
101 West Prospect Avenue
1800 Midland Building
Cleveland, Ohio  44115
(216) 696-1422
(216) 696-1210 (facsimile)

Attorneys for Plaintiff

## JURY DEMAND

Pursuant to Rule 38(B) of the Ohio Rules of Civil Procedure, Plaintiff, Dr. Adil Jaffer, hereby demands a trial by the maximum number of jurors allowed by law on all issues so triable.

*/s/ John E. Moran*
John E. Moran

17
Exhibit A